IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

          Plaintiff,

    vs.                      **Case No. 05-40065-01-RDR**

TRACY M. SMITH,

          Defendant.

_____

**MEMORANDUM AND ORDER**

    This matter is presently before the court upon defendant's motion for new trial.  Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

I.

    On February 13, 2007, a jury convicted the defendant of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 [Count 1]; managing or controlling a building (2820 SE Maryland in Topeka, Kansas) for the purpose of using, storing or distributing a controlled substance in violation of 21 U.S.C. § 856 [Counts 3 and 4]; managing or controlling a building (516 SE 29th Street in Topeka, Kansas) for the purpose of using, storing, or distributing a controlled substance in violation of 21 U.S.C. § 856 [Counts 5, 13, 20, 22 and 24]; distributing controlled substances in violation of 21 U.S.C. § 841(a)(1) [Counts 12, 15, 17, 18, 19, 21 and 23]; and using a communication facility to facilitate conspiracy to distribute controlled substances and distribution of

controlled substances in violation of 21 U.S.C. § 843(b) [Counts 14 and 16]. The jury found the defendant not guilty of one count of managing or controlling a building (2820 SE Maryland in Topeka, Kansas) for the purpose of using, storing and distributing a controlled substance in violation of 21 U.S.C. § 856. The jury did not reach a verdict on four counts and the court declared a mistrial on those charges. Following the verdict, the parties notified the court they had agreed that a decision on forfeiture would be made by the undersigned judge, not by the jury. The parties subsequently informed the court they were involved in negotiations that would probably result in a settlement of the forfeiture issues.

## II.

In the instant motion, Smith raises a variety of arguments. She contends that a new trial should be granted because (1) the government failed to provide materials to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963); (2) the government improperly used a peremptory challenge to remove an African-American woman from the jury; (3) the court erred in admitting evidence of a double homicide; (4) the government illegally destroyed evidence; (5) the evidence was insufficient to support her convictions; (6) the court erred in admitting evidence without a proper chain of custody; (7) the court erred in allowing the testimony of her former attorney; and (8) the court erred in

2

instructing the jury.  The court shall consider the contentions in seriatim.

In considering a motion for new trial, the district court has broad discretion.  United States v. Troutman, 814 F.2d 1428, 1455 (10th Cir. 1987).  The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal. Under Fed.R.Crim.P. 33, a court may grant a new trial "if the interest of justice so requires."  Additionally, any error which would require reversal on appeal is a sufficient basis for granting a new trial.  United States v. Walters, 89 F.Supp.2d 1206, 1213 (D.Kan. 2000) (quotation and citation omitted).  However, courts disfavor new trials, United States v. Gleeson, 411 F.2d 1091, 1093 (10th Cir. 1969), and exercise great caution in granting them, United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997). The burden of proving that a new trial is warranted rests on the defendant.  Walters, 89 F.Supp.2d at 1213 (citations omitted).

III.

The trial of this case lasted approximately three weeks.  The evidence at trial, when viewed in the light most favorable to the government, can be summarized as follows:

Members of the Shawnee County Sheriff's Department began a drug investigation of Tracy Smith in 2003.  As part of that investigation, officers performed trash pulls at Smith's residence at 2820 SE Maryland in Topeka, Kansas.  The trash pulls were

conducted on October 17, 2003, October 30, 2003 and December 5, 2003.  These trash pulls consisted of seizing trash bags that had been left outside Smith's residence for pick up by a trash hauler. On each occasion, the search of these bags led to the discovery of plastic baggies with corners missing.  Law enforcement officers are familiar with the practice of using corners of plastic baggies to hold small amounts of crack cocaine for sale and distribution.  The trash bags also contained mail addressed to the defendant at 2820 SE Maryland.  Sheriff's deputies also discovered small amounts of what appeared to be drug residue in the bags.  The residue was field tested and found to be positive for cocaine.

In addition to the trash pulls, officers conducted surveillance on Smith's business, Teray's, a clothing store located at 516 SE 29th Street in Topeka, Kansas.  Officers observed individuals frequently enter the store and leave without store sacks or packages.  These officers thought this activity was consistent with the purchase of small amounts of crack cocaine. Officers also saw what they believed was counter-surveillance by associates of Smith.

On December 13, 2003, two women were murdered and one was severely injured at 2817 SE Colorado in Topeka, Kansas.  Topeka Police Department officers believed that Smith might be involved in the matter.  As a result, they asked Shawnee County Sheriff's Department officers if they could accelerate their investigation so

that searches could be conducted of Smith's residence and business. On December 15, 2003, a search warrant was obtained and a search was conducted at defendant's residence at 2820 SE Maryland. During the search, officers found money and numerous documents. They also found what they believed were crib notes or documents showing sales records of drug transactions. The money discovered totaled approximately $14,000 and was found in several unusual places, including a safe located in the attic and a small padlocked door behind an entertainment center in the bedroom. The money was held together by rubber bands. Officers indicated that it was common to find money divided in this fashion in the drug business. The search also revealed a large quantity of plastic baggies, another item commonly associated with drug dealers. Finally, the search revealed a credit card belonging to Annette Roberson, one of the women who was murdered at 2817 SE Colorado.

Law enforcement officers also conducted a search of Teray's on December 15, 2003 pursuant to a search warrant. This search revealed one 9 mm bullet, some marijuana that belonged to someone else, and miscellaneous documents. Officers also found $1200 located in a candy bowl under the front counter and $262 in the cash register.

During the search of Teray's, officers asked Smith if she would be willing to talk with them about the homicides. She agreed to do so if her attorney, Chris Cowger, could accompany her. A

subsequent meeting was arranged.  On December 17, 2004,  Cowger and Smith spoke with Brian Hill, a detective with the Topeka Police Department.  During this meeting, Smith provided an oral statement to Cowger, who wrote it down and provided it to Detective Hill. This statement reads as follows:

Saturday Decemember (sic) 13, 2003, at about 3:15 pm Ms. Roberson called to go Chrismas (sic) shopping later in the day.  I waited at the store (Terays) until about 4:30 pm.  She did not come over to the store so I left to go shopping with my family who was in town.  She (Ms. Roberson) called me and told me she would be at the store in a little while.  Ms. Roberson called me and told me to pick her up at the store.  She called back and said Nicee (Ms. Thomas) would pick her up.  I asked her to stop by my house before she went to Nicee's.  She called back and asked to use my play station.  They came by my house about 5:30 & said they were going to spend a romantic evening together and if her boyfriend (Todd) came by to tell him she was Walmart & to call her.  That was the last time I ever saw them.

At about 6:00-6:15 pm Phil Cheatham (sic) came to my house.  He said he was back from KC and asked for a plate of food.  He took the food with him & left.

At about 8:00-8:15 pm Phil called me on my cell phone and said "You'll read about it" and hung up.  I called back & asked him what he was talking about and he said "All them bitches are dead."  I then called Ms. Roberson's phone to check on her.  Her phone got keyed and I heard Phil & another man talking.  I head Phil say "All them bitches are dead."  I heard the other guy saying "Where's Big Boy."  I believe the other guy is Evan Sel.  I heard one of them say call E-Class & clean the house up because police are going to be everywhere. I also heard they need to change clothes because there is blood on the clothes.  I heard them say we need to get out of here.

I tried to call him back and he said "Fuck you bitch" and then he hung up.

On several occassions (sic) Phil told me that he wished he knew where Officer Hill lived because he was going to kill him.  That he knew someone at the jail who would help him get his address.  I thought he was serious about it.

Various individuals came forward and agreed to act as confidential informants in the investigation of Smith.  Evidence was presented that Lester Campbell made drug buys from Smith in April 2004.  He contacted law enforcement officers because he wanted to clean up drug trafficking in his neighborhood.  Campbell began by going to Teray's.  He talked with Smith and indicated that he wanted to buy some drugs.  Smith gave Campbell the phone number for Dennis Torrence, who was a subordinate of Smith in the drug business.  He then proceeded to buy crack cocaine from Torrence on April 1, 2 and 5, 2004.  These purchases amounted to 2.5 grams of crack cocaine.  Torrence told Campbell that he got his drugs from Smith.  The jury did not reach a verdict on the charges arising from the alleged purchases made by Campbell.

James Jensen went to law enforcement in December 2003 following the murders and provided some information.  He later agreed to act as a confidential informant.  He had known Smith since approximately 2002 and they were very friendly.  He had purchased marijuana from her on a regular basis for about two years.  These purchases were conducted at her residence and at Teray's.  He made three purchases of drugs as a confidential informant.  He purchased 13.4 grams of crack cocaine directly from Smith on April 7, 2004 at Teray's.  He then purchased 4.94 grams of methamphetamine on April 26, 2004 from Torrence at Teray's.  He had

contacted Smith about buying the methamphetamine, but Torrence carried out the transaction. After the completion of the transaction, Smith called Jensen and said: "I see you got your package." Jensen later purchased 13.55 grams of crack cocaine at Teray's on April 19, 2004.

Sharriff Tilghman also acted as a confidential informant. He agreed to work with law enforcement after he was arrested on April 8, 2004. He initially called Smith and indicated that he wanted to buy some crack cocaine. He was told to go to a local gas station to make the purchase. He arrived and Torrence showed up. He purchased the 1.8 grams of crack cocaine from Torrence in Torrence's vehicle. On April 9, 2004, Tilghman made another purchase of crack cocaine. He again met Torrence at a local station and this time purchased 8.09 grams of crack cocaine. On April 10, 2004, Tilghman made another purchase of crack cocaine from Torrence. On this occasion, he purchased 2.4 grams of crack cocaine. On April 16, 2004, Tilghman received 3.4 grams of crack cocaine from Smith at Teray's. He had previously paid her for the cocaine on April 13, 2004, but did not receive it until April 16th.

Torrence was named as a co-defendant in this case. He entered into a plea agreement with the government and agreed to testify against Smith. At trial, he recounted his relationship with Smith. He indicated that they had "growed up together in Emporia." He became an employee at Teray's and also a "flunky" for Smith's drug

8

business.  He described Smith as a "kingpin" in the drug business.
He lived in a garage apartment near her residence.  He sold crack
cocaine for Smith at Teray's.  He also made numerous deliveries of
crack cocaine for her around Topeka.  He identified others who were
involved with Smith in the drug business, including Mike Prosper,
Phillip Cheatham and Rodney Lynch a/k/a Pee Wee.  Torrence saw
large amounts of crack cocaine at Smith's residence.  He also
observed that Smith had guns at both her business and her
residence.  He noted that Cheatham and Smith were very close.

James Worford first met Smith in 2003, after the murders.  He
began buying marijuana from her.  He bought it by the pound.
Sometimes, she fronted the marijuana to him.  He would usually make
the purchases at Teray's in Smith's office.  On other occasions,
either Smith or Pee Wee a/k/a Lynch would deliver the marijuana.
Worford also used Smith as a supplier for his crack cocaine
dealing.  Smith also fronted crack cocaine to him.  Their
relationship ended in early 2005.

Steven Bell approached law enforcement indicating a
willingness to provide information after he was indicted on drug
charges in 2004.  He had met Smith through Cheatham.  His mother
had introduced him to Cheatham in 2002.  Cheatham became interested
in Bell when he learned that Bell was selling drugs.  Bell had been
in the drug business since he was fourteen years old.  He taught
Cheatham how to turn powder cocaine into crack cocaine.  Bell was

aware that Cheatham was working for Smith in the drug business. Smith became interested in purchasing powder cocaine from Bell's source.  On two occasions, Bell arranged for the sale of powder cocaine to Smith.

Sheena Davis at one time indicated she had sold drugs for Smith.  She said she had done so over a four-year period.  At trial, she recanted her prior testimony on Smith's drug dealing and suggested she had been confused when she gave prior statements.

Ron Redmond was in custody with Smith in the United States Marshals jail in Topeka, Kansas prior to Smith's trial.  He testified that Smith told him that she ran a major drug operation in Topeka.  He further said that Smith told him that she had two women killed who tried to rob her.

Chris Cowger, who had provided legal services to Smith in the past, testified that he purchased small amounts of marijuana from her on ten to fifteen occasions during the period from 2003 to 2005.

Annetta Thomas, who was the woman severely injured on December 13, 2003, testified that she lived at 2817 SE Colorado with Cheatham.  Thomas and Roberson were homosexual lovers at that time. Thomas and Smith were good friends.  Smith had directed Cheatham to live with Thomas at her apartment.  Cheatham was an underling to Smith in the cocaine drug business.  He was referred to as Smith's "gopher," "flunky," or "bitch."  On several occasions, Thomas had

observed Cheatham and Smith make crack cocaine out of powder cocaine at her apartment. Cheatham was also an employee of Smith's at Teray's. At that time, Thomas was a crack cocaine user. She indicated she obtained her crack cocaine from Roberson. She said that Roberson obtained the crack cocaine from Smith. She indicated that Smith fronted the crack cocaine to Roberson, who then sold it. On one occasion, Thomas picked up crack cocaine for Roberson from Smith when Roberson was unable to do so.

Thomas also saw Smith sell crack cocaine to others at Teray's many times. Thomas believed that Teray's was only a front for Smith's drug operation. She said Smith kept the crack cocaine under the front counter or in her office. She purchased crack cocaine from Smith at Teray's on several occasions. She also purchased crack cocaine from Smith at 2820 SE Maryland.

Prior to the shooting, Cheatham told Thomas that a safe was missing from his room. He called Smith and Smith came over to Thomas' apartment. Thomas testified that Smith then asked her: "Did you take it because it was mine?" Cheatham eventually told Thomas that the safe had $10,000 in it.

On the night of the shooting, Cheatham and another man came to the apartment. Thomas, Roberson and another friend, Gloria Towns, were there. Thomas thought Cheatham was angry. Thomas felt Cheatham grab her and squeeze her. She then observed him shooting her. She pretended to play dead to stop the shooting. She was

11

shot at least seven times.  She saw the other women and believed they were dead.  After Cheatham left, Thomas dragged herself to the front door.  She observed what she thought was a white truck that she thought belonged to Smith drive by the apartment.

During the time of the shootings and shortly thereafter, Cheatham and Smith had several conversations on their cell phones. Smith also called Roberson's cell phone during the time of the murders and the call lasted over five minutes.

On June 5, 2005, another search warrant was executed at Smith's residence.  During the execution of this search warrant, law enforcement officers discovered and seized approximately $20,000.  This money was in plastic and was hidden in the dirt in a crawl space under the house.

IV.

A.  **FAILURE TO PROVIDE BRADY MATERIALS**

Smith contends that the government failed to provide certain impeachment information in a timely fashion as required by the court in an order issued prior to trial.  Specifically, Smith asserts that she did not receive the following evidence until the testimony of the witnesses involved at trial:  (1) Steven Bell would receive consideration at sentencing for assistance in this case; and (2) Sheena Davis would not have charges filed against her for her cooperation in this case.  Smith suggests that there is a reasonable probability that the jury would have reached a different

verdict if the government had "properly and timely informed Defendant that the cooperating individuals had received certain deals in exchange for their testimony."

Prior to trial, the court entered an order directing the government to provide all impeachment evidence to the defendant two weeks prior to the start of the trial.  The government has conceded that it did produce some impeachment evidence during the course of trial in violation of the court's order.  The government, however, suggests that it did so unintentionally and that its actions caused no prejudice to the defendant.

To establish a <u>Brady</u> violation, Smith must show that (1) the prosecutor suppressed evidence; (2) the evidence was favorable to her as exculpatory or impeachment evidence; and (3) the evidence was material.  <u>Knighton v. Mullin</u>, 293 F.3d 1165, 1172 (10th Cir. 2002).  Generally, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different.  <u>Id</u>.

In both instances noted by Smith, the impeachment evidence was either disclosed or learned by her counsel during the examination of the particular witness.  Her counsel had ample opportunity to examine each witness on the agreement that the witness had reached with law enforcement.  Counsel made no request for additional time to consider this evidence.  In the instant motion, Smith has failed to indicate how the earlier disclosure of this evidence would have

benefitted her defense.  The court is not persuaded that earlier disclosure would have led to a different result in this case.  <u>See</u> <u>United States v. Scarborough</u>, 128 F.3d 1373, 1376 (10th Cir. 1997) (no <u>Brady</u> violation where government makes Brady material available during trial, "[a]s long as ultimate disclosure is made before it is too late for the defendant[] to make use of any benefits of the evidence.").  Accordingly, the court finds that Smith is not entitled to a new trial based upon this argument.

## B.  JURY SELECTION

Smith contends that the government's use of one of its peremptory challenges to strike an African-American woman from the jury constituted an equal protection violation under <u>Batson v.</u> <u>Kentucky</u>, 476 U.S. 79 (1986).  The government argues that the record shows no support for Smith's contention.

Smith is an African-American woman.  During jury selection, two African-Americans, both women, were placed in the jury box. The government initially objected to the first woman based on cause.  The government contended that this potential juror had some knowledge of Smith's financial dealings because she was an employee of the bank where Smith had a bank account.  The government suggested that this knowledge might ultimately have some significance when the jury considered the forfeiture count in this case.  The government further noted that she may have been the employee who initially dealt with a subpoena that the government

14

issued for Smith's bank records.   After conducting an <u>in</u> <u>camera</u> interview with this juror and hearing argument from counsel, the court overruled the government's challenge for cause and allowed this juror to remain.   The government did not later exercise a peremptory challenge on this juror.

Another African-American woman was subsequently seated in the jury box.   After extensive questioning, the government exercised a peremptory challenge on this juror.   Smith's counsel immediately objected, contending that this challenge established a <u>Batson</u> violation.   The court was uncertain whether the defendant had established a prima facie case.   Nevertheless, the court asked the government to provide its reasons for the challenge.   Counsel for the government indicated that he had challenged the juror because (1) she had been terminated from her prior employment and was currently unemployed; and (2) she had gone to law school for a short period and therefore had some legal education.   The court determined that the defendant had failed to establish a <u>Batson</u> violation and allowed the government to strike her.

<u>Batson</u> established a three-step approach for determining whether a peremptory strike has been exercised in a racially discriminatory manner.   <u>Batson v. Kentucky</u>, 476 U.S. 79, 96-98 (1986).   When a <u>Batson</u> challenge is raised, the trial court must decide (1) whether the defendant has made a prima facie showing that the prosecution has exercised its peremptory strike on the

basis of race, id. at 96, (2) if so, whether the government has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question, id. at 97, and (3) if so, whether the defendant has carried his burden of persuasion of proving purposeful discrimination, id. at 98; see Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam).

To establish a prima facie case, a defendant must show that the circumstances raise an inference of racial discrimination. See Batson, 476 U.S. at 96. Such an inference may stem from a pattern of strikes against minority jurors included in the particular venire or even from the manner of the prosecution's questions and statements during voir dire examination. See id. at 97. However, because of the elusive nature of the inquiry, a trial judge is not limited to just these two sources for discriminatory inferences. See United States v. Stavroulakis, 952 F.2d 686, 696 (2nd Cir. 1992). Rather, a trial judge has "broad latitude to consider the totality of the circumstances when determining whether a defendant has raised an inference of discrimination." Id. (citing Batson, 476 U.S. at 97, 98 n. 21).

The court is not persuaded that the circumstances show that the defendant made a prima facie case of racial discrimination. "The fact a single minority venire member is peremptorily stricken, standing alone, is insufficient to establish the defendant's prima facie case." United States v. Abdush-Shakur, 465 F.3d 458, 469

(10th Cir. 2006).   Nevertheless, the court also finds that, in assessing all of the circumstances in the case and the government's explanations, there was no discriminatory intent involved.   Without question, the juror's brief legal career constitutes a race-neutral explanation for striking her.   The court finds that the defendant has failed to show purposeful discrimination.   Accordingly, the court finds no <u>Batson</u> violation here.[1]

## C.   EVIDENCE OF DOUBLE HOMICIDE

Smith contends that the court erred in allowing evidence of the double homicide that occurred on December 13, 2003.   She argues that this evidence was not relevant and was more prejudicial than probative.   Smith further asserts that some of the testimony offered on this issue was unreliable.

Smith initially raised this issue in a motion in limine prior to trial.   In that motion, she made arguments similar to those raised now.   The court determined, based upon the proffer presented

---

[1]The focus of Smith's <u>Batson</u> challenge was the government's use of a peremptory challenge to exclude one African-American from the jury.   However, Smith also suggests, albeit vaguely, that the government exercised peremptory challenges to strike women in violation of <u>Batson</u>.   Smith failed to make any such argument at trial.   Smith has failed to make a prima facie showing of intentional discrimination.   The jury that reached a decision in this case consisted of five women and seven men.   Both alternates who were released prior to deliberations were women.   The government exercised only three peremptory challenges during voir dire, two of them were used to strike women.   Nothing in these facts demonstrates a prima facie case of discrimination based upon gender.   Accordingly, to the extent that Smith raises this argument, we must reject it.

17

by the government, that the evidence appeared relevant and that its probative value was not outweighed by its prejudicial effect.

At trial, the court heard considerable evidence on this matter from a variety of witnesses.  This evidence, when viewed in the light most favorable to the government, showed the following:  (1) Cheatham was very upset over a safe that had been stolen from his room in Thomas' house at 2817 SE Colorado; (2) Smith told Detective Hill that she had told Towns, Roberson and Thomas that the safe belonged to her; (3) Cheatham was an underling in the Smith drug operation, described by others as Smith's "flunky" or "bitch"; (4) prior to the murders, Smith belittled Cheatham over the theft of the safe, questioning his manhood and driving him to tears; (5) Smith was on the telephone with Cheatham for several minutes during the time of the murders and just after the murders; (6) Thomas saw what she thought was Smith's vehicle drive by her residence at 2817 SE Colorado just after the murders occurred; (7) even though Smith had knowledge that the murders had occurred, she failed to notify law enforcement officers; (8) she indicated to Detective Hill following the murders that she knew who the second shooter was and agreed to provide that information, but never did so; (9) within a week after the murders, Smith told an associate that Cheatham did not have to kill the women, he just needed to pistol whip them and put a gun in their mouths and make them think they were dead; and (10) Smith told Redmond that she had someone kill two women who had

18

stolen something from her.

At the conclusion of the case, the court instructed the jury as follows on how to consider this issue:

> The government contends that defendant was involved in directing a double homicide to further the drug conspiracy alleged in Count 1. Defendant denies any involvement in the double homicide. If you believe that defendant ordered the double homicide and that it was ordered in furtherance of the drug conspiracy alleged in Count 1, then you may consider that evidence in deciding whether defendant is guilty or not guilty of Count 1. Otherwise, you should disregard the evidence of the double homicide in deciding whether defendant is guilty or not guilty of the charge in Count 1. The evidence of the double homicide should not be considered in your deliberations regarding the other counts of the indictment.

Having carefully reviewed all of the evidence presented at trial, the court is convinced that this issue was properly presented and considered by the jury. In a conspiracy prosecution, uncharged acts "committed in furtherance of the charged conspiracy are themselves part of the act charged." United States v. Green, 175 F.3d 822, 831 (10th Cir. 1999). Thus, conduct which occurs during the life of a conspiracy and is a part of the same is direct evidence of the conspiracy. United States v. Portillo-Quezada, 469 F.3d 1345, 1353 (10th Cir. 2006). While the evidence of Smith's involvement in the murders was entirely circumstantial, we find, at least for the purposes of admissibility, there was sufficient evidence to tie her to them and to tie them to the charged conspiracy. This evidence demonstrated that Smith was willing to use violence to ensure the success of her drug operation.

In addition, the court is not convinced that the evidence presented was unduly prejudicial.   As explained in Portillo-Quezada:

> We test for unfair prejudice using a balancing test under Federal Rule of Evidence 403. See United States v. Tan, 254 F.3d 1204, 1211 (10th Cir.2001). To be excluded, evidence must do more than "damage the [d]efendant's position at trial." Id. It must "make[ ] a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or [innocence] of the crime charged." u. at 1212. "[E]xclusion of evidence under Rule 403 ... is an extraordinary remedy and should be used sparingly." Id. at 1211. To be a basis for mistrial, the evidence "must have an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir.1991) (internal quotations omitted).

Id. at 1354.

The court is not persuaded that the evidence concerning the murders was unduly prejudicial.   The government did introduce some photographs of the murders, which were graphic, but we do not find that they were unduly prejudicial.   The jury had some expectation that these photographs would be lurid given the testimony provided by the survivor of the shootings.   Nevertheless, we do not find that they were unduly prejudicial.   They were probative to show the lengths to which Smith would go to protect the conspiracy's interests.   Accordingly, we do not find error in the admission of the evidence concerning the murders.

## D.   DESTRUCTION OF EVIDENCE

Smith contends that the government improperly destroyed

evidence during the investigation of this case by: (1) depositing the currency recovered from her residence on two occasions; (2) failing to produce evidence recovered from trash pulls; and (3) failing to fingerprint certain evidence.

During the trial, Smith raised the argument that the government had destroyed evidence by failing to maintain the monies that were seized from her residence. The court rejected that argument and issued a written opinion setting forth the facts and the applicable law. In this motion, Smith has failed to offer any new arguments on this issue. For the reasons stated in the court's order of February 6, 2007, the court finds no basis for a new trial based on this contention.

Smith next contends that the government destroyed evidence by failing to produce materials that were seized from certain trash pulls. Smith suggests that the government conducted trash pulls where no reports were written and the items recovered from the trash were not retained. She argues that these items "may have had exculpatory value." The government has responded that it had no obligation to produce any evidence concerning other trash pulls because it offered no evidence concerning these trash pulls during its case-in-chief. In addition, the government argues that there is no obligation under Brady to provide any evidence from these trash pulls because nothing exculpatory was found.

The court agrees entirely with the response made by the

government.   Smith has failed to provide any support for this
contention, and the court has not discovered any.   Any suggestion
that these trash pulls "may" have contained exculpatory evidence is
simply insufficient to trigger <u>Brady</u>.   As pointed out by the
government, the fact that the trash pulls contained nothing
inculpatory does not mean they contained exculpatory evidence.   The
court finds no basis to support this particular claim.

Finally, Smith asserts that the government destroyed evidence
by failing to fingerprint a 9 mm bullet that was recovered from
Teray's during the execution of the search warrant on December 15,
2003.   She suggests the following in support of this argument:   "If
the evidence would have been properly fingerprinted, such would
have produced the exculpatory evidence that Defendant's
fingerprints were not on the recovered items."

The court finds a number of problems with this argument.
First, the court does not find that any violation of due process
occurred.   <u>See</u> <u>Peoples v. Hocker</u>, 423 F.2d 960, 964 (9th Cir. 1970)
(failure to conduct fingerprint and ballistic tests did not deprive
defendant of due process).   Second, even if a fingerprint analysis
had been performed and it showed that Smith's prints were not on
the bullet, this evidence would hardly have been exculpatory of any
of the charges brought against Smith.   The bullet was apparently
introduced to show either that Smith at some time possessed
firearms as suggested by some of the testimony or that she was

involved in the double homicide.  Regardless, the bullet was of very limited significance.  As pointed out by the government, even if Smith did not touch this particular bullet, this does not mean that Smith did not order Cheatham to commit the murders.  In sum, the court fails to find any support for Smith's contention that the failure of law enforcement to fingerprint the bullet constituted destruction of evidence.

**E.   INSUFFICIENT EVIDENCE**

Smith argues that the evidence was insufficient to support her convictions.  Thus, she asserts she is entitled to a new trial.

"Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Pettigrew, 468 F.3d 626, 639 (10th Cir. 2006) (quotation omitted), cert. denied, 127 S.Ct. 1243 (2007).  In conducting our review, we consider both direct and circumstantial evidence, as well as the reasonable inferences to be drawn therefrom, and "it is not our duty to weigh conflicting evidence [ ] or to consider the credibility of witnesses." United States v. Brooks, 438 F.3d 1231, 1236 (10th Cir. 2006).

*Conspiracy*

Smith spends little time arguing that evidence in support of her conviction of conspiracy to distribute controlled substances was insufficient.  She suggests only that the evidence introduced

23

at trial "consisted of little more than evidence that she associated with individuals who sold or used drugs."

To establish a conspiracy, the government was required to show: "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, ... (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." United States v. Evans, 970 F.2d 663, 668 (10th Cir. 1992) (internal quotation and citation omitted). This burden may be met by either direct or circumstantial evidence. Id.

The evidence of Smith's involvement in a conspiracy to distribute controlled substances was overwhelming. The court heard evidence from a number of witnesses who established and corroborated Smith's drug distribution network. Moreover, Smith's involvement was corroborated by tape recorded conversations over the telephone and in person. Finally, a wealth of circumstantial evidence demonstrated her guilt. There is little question that the evidence, when viewed in the light most favorable to the government, clearly demonstrated that Smith was guilty of conspiracy to distribute controlled substances.

*Managing or Controlling 2820 SE Maryland For the Purpose of Using, Storing and Distributing a Controlled Substance*

Smith contends there was insufficient evidence to support her convictions in Counts 3 and 4 because there was no evidence to establish that the items found in her trash belonged to her. She

24

asserts that the evidence presented at trial showed that other individuals lived at her residence and might have placed those objects in the trash.

To establish a violation of 21 U.S.C. § 856(a)(2), the government was required to prove that the defendant: (1) managed or controlled any place, (2) as an owner or lessee, and (3) knowingly and intentionally made the place available for the purpose of unlawfully manufacturing, storing, distributing or using controlled substances. United States v. McCullough, 457 F.3d 1150, 1161 (10th Cir. 2006).

Smith takes a rather narrow look at the evidence that was presented at trial. A number of witnesses testified at trial that they purchased controlled substances from Smith at her residence or they saw controlled substances there that belonged to her. The searches at her house revealed large amounts of money that were packaged in a manner that was consistent with drug activity. Officers also discovered a large amount of plastic baggies, items quite common in the drug trafficking business, during the search of her house on December 15, 2003. The evidence obtained from the trash pulls only corroborated the other testimony and evidence in the record. A rational jury could conclude that Smith managed or controlled her residence with the knowledge that it was being used for the distribution of controlled substances in violation of 21 U.S.C. § 856.

*Managing or Controlling 516 SE 29th Street For the Purpose of Using,
Storing and Distributing a Controlled Substance*

Smith next contends there was insufficient evidence to support
her convictions in Counts 5, 13, 20, 22 and 24 because there was no
evidence that controlled substances belonging to her were found at
Teray's.   She further suggests that the witnesses who testified
that they purchased controlled substances at Teray's were lacking
credibility.

Again, Smith has taken a rather restrictive view of the
evidence presented at trial.   She is correct that no controlled
substances belonging to her were found at Teray's.   However, the
evidence was overwhelming from the testimony of a number of
witnesses that she sold drugs at Teray's on a repeated basis from
2003 through 2005.   The fact that no drugs were found during the
searches that were executed at Teray's does not render the evidence
insufficient on these charges.   Moreover, Smith's suggestion that
the witnesses who testified about purchasing these controlled
substances lacked credibility also does not support her contention
that the evidence was insufficient.   "In conducting [a sufficiency
of the evidence] review, this Court may neither weigh conflicting
evidence nor consider the credibility of witnesses.   It is for the
jury, as the fact finder, to resolve conflicting testimony, weigh
the evidence, and draw inferences from the facts presented."
United States v. Zabriskie, 415 F.3d 1139, 1144 (10th Cir. 2005)
(internal citation and quotations omitted).   In sum, the court

finds no merit to Smith's arguments.

*Distribution of Controlled Substances*

Smith asserts that the evidence supporting her convictions for distribution of controlled substances is lacking because the informants involved were unreliable for a variety of reasons. Smith suggests that "hard evidence" is absent because law enforcement officers did not witness the transactions, and recordings of the events were of poor quality.

Here, the jury considered the testimony of all of the informants along with all the evidence bearing on their credibility. While it is true that all of the informants who testified for the government had issues concerning their credibility, the jury was entitled to find their testimony credible notwithstanding Smith's effort to impeach them.

The evidence, when viewed in the light most favorable to the government, was sufficient for the jury to find all of the essential elements of each of the charges for distribution of controlled substances. Accordingly, we must reject this argument as well.

*Unlawful Use of a Communication Facility*

Smith again argues that there was insufficient evidence to support the convictions on two counts, Counts 14 and 16. Smith suggests that the evidence was insufficient because (1) the tape recorded telephone conversations which form the basis of these

27

charges were of poor sound quality; and (2) the person to whom the call was made by the informant could not be identified.

The court finds no merit to either of the arguments asserted by Smith. Some of the tape recordings were not distinct and clear. However, they were adequate. The admissibility of tape recordings that are partially inaudible is within the sound discretion of the court. United States v. Hanif, 1 F.3d 998, 1002 (10th Cir. 1993). The recordings are admissible unless the inaudible portion is "so substantial as to render untrustworthy the recording as a whole." United States v. McIntyre, 836 F.2d 467, 469 (10th Cir. 1987). The court believes that the tape recordings were properly admitted. In addition, the court properly instructed the jury on how to consider these recordings, and Smith does not suggest that the jury did not follow the court's instructions. The court further believes that the speakers were identified on each of the recordings that were admitted into evidence. This identification was made either by someone who participated in the telephone call or by someone who was familiar with the voice from prior experience. See United States v. Sexton, 119 Fed.Appx. 735, 742-43 (6th Cir. 2005) (testimony of witnesses who heard recorded conversations on tapes made by confidential informant during several recorded drug buys and who were familiar with the voices on those tapes was sufficient to identify or authenticate speakers on tapes). In sum, the court finds that there was sufficient evidence to support the convictions

28

on the telephone counts.

**F.  CHAIN OF CUSTODY**

Smith contends she is entitled to a new trial on Counts 15, 17, 18 and 19 due to the government's failure to establish a proper chain of custody.  Smith suggests that the proper chain of custody was lacking on these counts because Sharriff Tilghman did not testify for the government in this case.

These particular counts involved distribution of controlled substances by Smith to Tilghman.  After his arrest on other charges, Tilghman began cooperating with law enforcement.  He immediately placed a telephone call to Smith and sought to purchase some crack cocaine.  Smith put him in contact with her underling, Dennis Torrence, who proceeded to make four sales of crack cocaine to Tilghman.  On each occasion, Tilghman was searched before and after the transaction.  He was kept under surveillance during each of the transactions.  On each occasion, he produced crack cocaine to law enforcement officers upon completion of the transaction.  Tilghman was not called as a witness for the government during the trial.

The defendant challenges the admission into evidence of the packages of crack cocaine, alleging that the government failed to establish a proper chain of custody.  The decision to admit or exclude evidence is within the sound discretion of the trial court. United States v. Levine, 970 F.2d 681, 688 (10th Cir. 1992).

29

Physical evidence may be admitted when there has been a showing
that the exhibit offered is in substantially the same condition as
it was when the crime was committed.  United States v. Aviles, 623
F.2d 1192, 1197 (7th Cir. 1980).  "Absent a clear showing of abuse
of discretion, challenges to the chain of custody go to the weight
of evidence, not its admissibility."  United States v. Levy, 904
F.2d 1026, 1030 (6th Cir. 1990), cert. denied, 498 U.S. 1091 (1991).
A perfect chain of custody is not a prerequisite to admission.
United States v. Smith, 308 F.3d 726, 739 (7th Cir. 2002).  "[A]
missing link does not prevent the admission of real evidence, so
long as there is sufficient proof that the evidence is what it
purports to be and has not been altered in any material aspect."
United States v. Howard-Arias, 679 F.2d 363, 366 (4th Cir. 1982)
(quoting United States v. Jackson, 649 F.2d 967 (3rd Cir.), cert.
denied, 454 U.S. 1034 (1981)).

     The court continues to believe that an adequate chain of
custody was demonstrated by the government.  The totality of the
circumstances indicate that the crack cocaine purchased by Tilghman
on four occasions was the crack cocaine that was admitted at trial.
See Sexton, 119 Fed.Appx. at 746 (fact that confidential informant
who made controlled buys of illegal drugs did not testify at trial
did not harm chain of custody).  Moreover, the court believes that
Smith's argument goes to the weight of the evidence, not its
admissibility.  Any problems with the chain of custody were to be

resolved by the jury. Accordingly, the court does not find that Smith is entitled to a new trial on these counts on the basis of an unreliable chain of custody.

**G.  ADMISSION OF TESTIMONY FROM DEFENDANT'S FORMER ATTORNEY**

Smith has suggested that the court erred in allowing the testimony of her former attorney, Chris Cowger. She has suggested that she is entitled to a new trial because he violated his ethical obligations to her by testifying.

Cowger was subpoenaed by the government to testify. He obtained counsel on his own and proceeded to testify that he bought small amounts of marijuana from Smith on ten to fifteen occasions. Prior to his testimony at trial, Smith objected to the testimony on grounds of attorney-client privilege and relevancy.

The court certainly had reservations about this testimony prior to its introduction. The court made clear that the government should avoid any discussion of any matters that might involve matters protected by the attorney-client privilege. Based upon the proffer offered by the government, the court determined that such evidence should be allowed.

Smith has failed to show how Cowger's testimony violated any ethical obligations. Moreover, she has also failed to provide any authority for such an argument. Finally, she has failed to show how the attorney-client privilege was violated by this testimony. In sum, the court fails to find that Smith has demonstrated that

31

any error occurred in the admission of this testimony.

**H.   IMPROPER JURY INSTRUCTIONS**

Smith argues that the court erred in instructing the jury. Specifically, she contends that the court mistakenly instructed the jury on how to consider:  (1) the double murder in the context of the charged conspiracy; and (2) the testimony of informants.

Smith initially suggests that the court erred in not instructing the jury that they must find beyond a reasonable doubt that she ordered the homicides before it could consider that evidence in determining her guilt on the conspiracy charge.

As noted previously, the court instructed the jury as follows concerning the evidence of the double murders:

> If you believe that the defendant ordered the double homicide and that it was ordered in furtherance of the drug conspiracy alleged in count 1, then you may consider that evidence in deciding if defendant is guilty or not guilty of Count 1.

Unlike most other types of conspiracies, conviction of a drug conspiracy under § 846 does not require proof of any overt act. United States v. Williams, 374 F.3d 941, 949 (10th Cir. 2004).  In order to convict a defendant of a § 846 conspiracy, the government must prove only the existence of a conspiracy, that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy.  Id.  The existence of a conspiracy may be established through direct or circumstantial evidence.  United States v. Saviano, 843 F.2d 1280, 1294 (10th Cir.

32

1988).  A defendant's knowing participation in the conspiracy may be established through proof of surrounding circumstances, such as acts committed by the defendant which furthered the purpose of the conspiracy.  <u>See</u> <u>United States v. Wacker</u>, 72 F.3d 1453, 1469 (10th Cir. 1995) (uncharged acts evidence probative to demonstrate a criminal defendant's intent and plan in the context of a conspiracy prosecution).

Smith has offered no support for her contention that the court erred by failing to instruct the jury that they must find beyond a reasonable doubt that she ordered the murders in order to consider them in determining her guilt on the conspiracy charge.  The court has also failed to discover any legal support for this argument.  The court believes that it adequately instructed the jury on this issue.

Smith next contends that the court should have used the language that she proposed for the jury's consideration of the testimony of informants.  She asserts that the court should have included the following language taken from <u>United States v. Bernal-Obesco</u>, 989 F.2d 331, 333 (9th Cir. 1993) in its instruction on this issue:

> Use of informants to investigate and prosecute persons engaged in clandestine activities is fraught with peril. . .by definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom.

33

The court refused to use the language proposed by Smith. Rather, the court instructed the jury as follows:

> An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence.  You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness.  You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.
> You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

In reviewing jury instructions, the court must determine if the instructions properly state the law and provide the jury with ample understanding of the issues and the standards applicable. Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1271 (10th Cir. 1988).  The instructions must cover the issues presented by the evidence and accurately state the law.  United States v. Davis, 953 F.2d 1482, 1492 (10th Cir.), cert. denied, 504 U.S. 945 (1992).  A new trial is warranted only when a failure to give an instruction is prejudicial in view of the entire record.  United States v. Martin, 18 F.3d 1515, 1519 (10th Cir.), cert. denied, 513 U.S. 868 (1994).

The instruction requested by the defendant was adequately covered by the instruction given by the court.  Since the court's instruction adequately covered the point sought by the defendant,

34

we find no basis for a new trial.  See Webb v. ABF Freight Systems, Inc., 155 F.3d 1230, 1248 (10th Cir. 1998) ("[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law."), cert. denied, 526 U.S. 1018 (1999); Oertle v. United States, 370 F.3d 719, 726 (10th Cir. 1966) (district court not required to give proposed jury instruction, even though substantively correct, if point of law it refers to is fairly and adequately covered by the instructions), cert. denied, 387 U.S. 943 (1967).

V.

In sum, the court finds no merit to any of the arguments offered by the defendant.  The court finds that Smith is not entitled to a new trial.

**IT IS THEREFORE ORDERED** that defendant Smith's motion for new trial (Doc. # 209) be hereby denied.

**IT IS SO ORDERED.**

Dated this 13th day of April, 2007 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge

35